839 A.2d 277

**Earl NIXON, Reginald Curry, Kelly Williams, Marie Martin, Theodore Sharp, and Resources for Human Development, Inc., Appellees**

v.

**The COMMONWEALTH of Pennsylvania, Department of Public Welfare of the Commonwealth of Pennsylvania, Department of Aging of the Commonwealth of Pennsylvania, and Department of Health of the Commonwealth of Pennsylvania, Appellants.**

Supreme Court of Pennsylvania.

Argued April 8, 2003.

Decided Dec. 30, 2003.

John G. Knorr, D. Michael Fisher, Calvin Royer Koons, Harrisburg, for Department of Public Welfare, et al.

Sharon M. Dietrich, David Jon Wolfsohn, Philadelphia, Janet Fran Ginzberg, Peter Houghton LeVan, Philadelphia, Seth F. Kreimer, for Earl Nixon, et al.

Harold I. Goodman, Philadelphia, for Pennsylvania Alliance for Retired Americans, et al.

Christine S. Dutton, for PA Ass'n of County Affiliated Homes, et al.

Before CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION OF THE COURT*

Justice NIGRO.

This case involves an appeal from the December 11, 2001 opinion and order of the Commonwealth Court declaring the criminal records chapter, 35 P.S. §§ 10225.501—10225.508,[1] of the Older Adults Protective Services Act (the "OAPSA"), 35 P.S. §§ 10225.101—10225.5102,[2] unconstitutional as applied to Appellees Earl Nixon, Reginald Curry, Kelly Williams, Marie Martin, and Theodore Sharp (the "Employees"). We affirm the Commonwealth Court's decision, although for different reasons.

1. Act of December 18, 1996, P.L. 1125, No. 169, *amended by* Act of June 9, 1997, P.L. 160, No. 13.

2. Act of November 6, 1987, P.L. 381, No. 79 (35 P.S. §§ 10211—10224), *amended by* Act of December 18, 1996, P.L. 1125, No. 169 (*recodified as amended* at 35 P.S. §§ 10225.101—10225.5102).

In November 1987, the General Assembly enacted the OAP-SA, declaring as follows:

It is declared the policy of the Commonwealth of Pennsylvania that older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare. It is not the purpose of this act to place restrictions upon the personal liberty of incapacitated older adults, but this act should be liberally construed to assure the availability of protective services to all older adults in need of them. Such services shall safeguard the rights of incapacitated older adults while protecting them from abuse, neglect, exploitation and abandonment. It is the intent of the General Assembly to provide for the detection and reduction, correction or elimination of abuse, neglect, exploitation and abandonment, and to establish a program of protective services for older adults in need of them.

35 P.S. § 10225.102. In furtherance of this stated objective, the OAPSA establishes a network of agencies in areas throughout the Commonwealth to provide protective services for older adults,[3] as well as patients in any of the facilities covered by the OAPSA ("covered facilities").[4] *See* 35 P.S.

---

3. An "older adult" is defined by the OAPSA as any person in the Commonwealth who is 60 years of age or older. *See* 35 P.S. § 10225.103.

4. The facilities covered by the OAPSA include a wide range of for-profit and non-profit business organizations that serve individuals who are elderly, disabled, infirm, or otherwise unable to live independently. The OAPSA defines a "facility" as a domiciliary care home, a home health care agency, a long-term care nursing facility, an older adult daily living center, or a personal care home. *See* 35 P.S. § 10225.103. These terms are more specifically defined in various other statutes. *See* *id.*

A domiciliary care home is "a protected living arrangement in the community which provides a safe, supportive homelike residential setting for three or less adults who are unrelated to the domiciliary care provider, who cannot live independently in the community, and who are placed by an area agency." 71 P.S. § 581–2. A home health care agency is "[a]n organization or part thereof staffed and equipped to provide nursing and at least one therapeutic service to persons who are disabled, aged, injured or sick in their place of residence." 35 P.S.

§§ 10225.103, 10225.301, 10225.304. The OAPSA further provides that any person may report to these area agencies that an older adult is in need of services, and the agency must promptly investigate the matter and provide protective services to the older adult if necessary.[5] 35 P.S. §§ 10225.302—10225.304.

In December 1996, the General Assembly amended the OAPSA by adding a criminal records chapter. *See* 35 P.S. §§ 10225.501—10225.508. This chapter required any applicant seeking employment in a covered facility as well as any employee who had worked at a covered facility for less than two years to submit a criminal records report to the facility. *See* 35 P.S. § 10225.502(a); *see also* 35 P.S. § 10225.508 (Pa.Stat.1996—1997). The chapter also prohibited covered facilities from hiring applicants or retaining employees whose reports revealed that they had been convicted of certain violent or sexual crimes, including first and second degree murder, rape, various degrees of sexual assault and indecent assault, and sexual abuse of children. *See* 35 P.S. § 10225.503 (Pa.Stat.1996—1997). In addition, the chapter prohibited the hiring or retention of persons whose records revealed that they had been convicted of other enumerated crimes, including

§ 448.802a. A long-term nursing facility is "[a] facility that provides either skilled or intermediate nursing care or both levels of care to two or more patients, who are unrelated to the licensee, for a period exceeding 24 hours." *Id.* An older adult daily living center includes "[a]ny premises operated for profit or not-for-profit in which older adult daily living services are simultaneously provided for four or more adults who are not relatives of the operator." 62 P.S. § 1511.2. A personal care home includes "any premises in which food, shelter and personal assistance or supervision are provided for a period exceeding twenty-four hours for four or more adults who are not relatives of the operator, who do not require the services in or of a licensed long-term care facility but who do require assistance or supervision in such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration." 62 P.S. § 1001.

5. In 1997, the General Assembly added a mandatory reporting chapter to the OAPSA, requiring that employees and administrators in covered facilities report suspected abuse of patients to area agencies, as well as to law enforcement officials in cases of sexual abuse, serious bodily injury, or a suspicious death. *See* 35 P.S. §§ 10225.701—10225.707, Act of June 9, 1997, P.L. 160, No. 13.

third degree murder, aggravated assault, kidnapping, arson, burglary, robbery, forgery, felony drug crimes, and endangering the welfare of children, within ten years of the time that the background check was conducted. *See id.* The chapter, however, was not to take effect until July 1, 1998.

Approximately one year before the criminal records chapter was to take effect, the General Assembly amended certain provisions of the chapter. *See* Act of June 9, 1997, P.L. 160, No. 13. Among other things, the amendments changed section 508 to require only new applicants and those employees who had been at a facility for less than a year before the effective date of the Act to submit criminal record reports.[6] *See* 35 P.S. § 10225.508(1). In addition, the amendments removed the ten-year limitation period on the second category of offenses listed in section 503(a) of the chapter, so as to permanently prohibit a covered facility from hiring or retaining those persons whose criminal records established that they had been convicted of any one of the enumerated crimes. *See* 35 P.S. § 10225.503(a). Specifically, section 503, as amended, provides:

a) General rule.—In no case shall a facility hire an applicant or retain an employee required to submit [criminal records reports] if the applicant's or employee's criminal history

6. Section 508 states:

This chapter shall apply as follows:

(1) An individual who, on the effective date of this chapter, has continuously for a period of one year been an employee of the same facility shall be exempt from section 502 [the section requiring that employees submit to criminal records checks] as a condition of continued employment.

(2) If an employee is not exempt under paragraph (1), the employee and the facility shall comply with section 502 within one year of the effective date of this chapter.

(3) If an employee who is exempt under paragraph (1) seeks employment with a different facility, the employee and the facility shall comply with section 502.

(4) An employee who has obtained the information required under section 502 may transfer to another facility established and supervised by the same owner and is not required to obtain additional reports before making the transfer.

35 P.S. § 10225.508.

record information indicates the applicant or employee has been convicted of any of the following offenses:

(1) An offense designated as a felony under ... The Controlled Substance, Drug, Device and Cosmetic Act.

(2) An offense under one or more of the following provisions of 18 Pa.C.S. (relating to crimes and offenses):

Chapter 25 (relating to criminal homicide).

Section 2702 (relating to aggravated assault).

Section 2901 (relating to kidnapping).

Section 2902 (relating to unlawful restraint).

Section 3121 (relating to rape).

Section 3122.1 (relating to statutory sexual assault).

Section 3123 (relating to involuntary deviate sexual intercourse).

Section 3124.1 (relating to sexual assault).

Section 3125 (relating to aggravated indecent assault).

Section 3127 (relating to indecent exposure).

Section 3301 (relating to arson and related offenses).

Section 3502 (relating to burglary).

Section 3701 (relating to robbery).

A felony offense under Chapter 39 (relating to theft and related offenses) or two or more misdemeanors under Chapter 39.

Section 4101 (relating to forgery).

Section 4114 (relating to securing execution of documents by deception).

Section 4302 (relating to incest).

Section 4303 (relating to concealing death of child).

Section 4304 (relating to endangering welfare of children).

Section 4305 (relating to dealing in infant children).

Section 4952 (relating to intimidation of witnesses or victims).

Section 4953 (relating to retaliation against witness or victim).

A felony offense under section 5902(b) (relating to prostitution and related offenses).

Section 5903(c) or (d) (relating to obscene and other sexual materials and performances).

Section 6301 (relating to corruption of minors).

Section 6312 (relating to sexual abuse of children).

*Id.* The criminal records chapter, with these amendments, went into effect on July 1, 1998.

On August 8, 2000, the Employees and Appellee Resources for Human Development, Inc. ("RHD"), a nonprofit corporation that administers several residential service programs that are considered covered facilities under the OAPSA, filed a petition for review in the nature of a complaint in equity in the Commonwealth Court. The Employees and RHD argued in the petition that the criminal records chapter: (1) violated the Employees' right to substantive due process guaranteed under Article I, section 1 of the Pennsylvania Constitution by unreasonably and arbitrarily infringing on their right to pursue a lawful occupation; (2) violated the Employees' right to procedural due process guaranteed under the Pennsylvania Constitution by irrebuttably presuming them to be disqualified for employment in the covered facilities; and (3) violated RHD's right to substantive due process by unreasonably interfering with its right to employ qualified employees. The Employees and RHD requested as a remedy a declaration that the criminal records chapter was unconstitutional as applied to the Employees. They also sought a preliminary and permanent injunction to enjoin Appellants, the Commonwealth of Pennsylvania, the Department of Aging, the Department of Public Welfare, and the Department of Health (the "Commonwealth Parties"),[7] from enforcing the criminal records chapter against the Employees, or, alternatively, from enforcing it against RHD or any other covered facility that wanted to employ the Employees.[8]

7. The Department of Aging, the Department of Public Welfare, and the Department of Health are the agencies responsible for administering and enforcing the OAPSA. *See* 35 P.S. §§ 10225.504, 10225.505(a)(3).

8. In addition to requesting injunctive relief in their petition for review, the Employees and RHD filed a separate petition for a preliminary injunction with an attached memorandum of law.

The Employees and RHD filed multiple declarations in support of their petition for review and separate petition for a preliminary injunction. Each of the Employees filed declarations averring to their work history in the health care field, their criminal records, and their inability to continue to work in covered facilities due to the criminal records chapter.[9] The

9. Earl R. Nixon averred in his declaration that he worked in the health care field for about ten years as a direct care specialist and resident manager in a facility for mentally retarded patients, a resident manager in a retirement community, and the manager of an assisted living facility. In 2000, Mr. Nixon left his job as manager of the assisted living facility and, since that time, he has not been able to obtain a position in Pennsylvania in the health care field because he was convicted in 1971 of possession of a controlled substance. Mr. Nixon now works as a manager for a senior citizen's complex in Michigan. *See* Memo. of Law in Support of Plaintiffs' Petition for Preliminary Injunction ("Memo."), Exh. A, Declaration of Earl R. Nixon.

Reginald Curry averred in his declaration that he worked for over twenty years as a counselor for juvenile delinquent children, for six years as a resident counselor for mentally retarded patients, and for three years as a paratransit driver for seniors. After spending the next seven years outside of the health care field, Mr. Curry returned to the field in 1998 as a driver for patients with mental health and retardation issues. One year later, Mr. Curry was laid off from this position because his criminal record indicated that he had been convicted of larceny in 1973 for stealing $30.00. Mr. Curry now works for RHD assisting homeless persons in shelters. *See* Memo., Exh. B, Declaration of Reginald Curry.

Kelly Williams averred in her declaration that she spent several years working as a nursing assistant in a correctional facility and later obtained a degree in phlebotomy and worked for a physician group. In 1999, she took a position as a phlebotomist for a hospital, which required her to travel to nursing homes to draw patients' blood. Six months later, Ms. Williams was laid off from that position due to a 1976 conviction for armed robbery. Ms. Williams is now working for a large medical group. *See* Memo., Exh. D, Declaration of Kelly Williams.

Marie Martin averred in her declaration that she began working in the health care field in 1991, first as a private duty nurse and then as a nursing assistant in a rehabilitation and nursing center. In 1997, she started working as a residential staff member at a home for mentally disabled adults. She was later laid off from this position because she had been convicted of several drug felonies in 1988. She now works for a nursing center in New Jersey. *See* Memo., Exh. F, Declaration of Marie Martin.

Theodore Sharp averred in his declaration that he has worked as a case manager in a facility for mentally ill patients since 1992. Although he was convicted of possession of drugs in California in 1975, Mr. Sharp has not lost his job because he held it for more than a year before the criminal records chapter was enacted. The criminal records

associate director of RHD also submitted a declaration averring that because of the criminal records chapter, RHD had to lay off twenty-five employees, including two of the Employees.[10] *See* Memo. of Law in Support of Plaintiffs' Petition for Preliminary Injunction, Exh. J, Declaration of Dennis Roberts, at 2–3.

On August 31, 2000, Judge Dan Pellegrini of the Commonwealth Court held a hearing on the petition for a preliminary injunction. During the hearing, the Commonwealth Parties stipulated to the factual averments in the petition for review and petition for a preliminary injunction, including the relevant background of each Employee and RHD. *See* N.T., 8/31/2000, at 3, 6. They also agreed that the only issue in dispute was the constitutionality of the criminal records chapter. *See id.* After hearing arguments, Judge Pellegrini denied the request for a preliminary injunction, finding that because the criminal records chapter had been in place for three years prior to the hearing, the Employees and RHD were not at risk of suffering immediate harm if an injunction was not granted. *Id.* at 6–7. Nevertheless, Judge Pellegrini

chapter nevertheless prohibits Mr. Sharp from ever working at another covered facility. *See* Memo., Exh. H, Declaration of Theodore Sharp.

**10.** The Employees and RHD also filed declarations from some of their former or present supervisors, a professor of public health at Columbia University, the president of a drug and alcohol service organization, and the director of a mental health association. The supervisors who submitted declarations averred that certain of the Employees had worked for them, that they were satisfied with the Employees' work, and that they would rehire the Employees if they could. *See* Memo., Exh. C, Declaration of Cheryl Murray (regarding Reginald Curry), Exh. E, Declaration of Dr. Paul Belser (regarding Kelly Williams), Exh. G, Declaration of Barbara Kling (regarding Marie Martin), and Exh. I, Declaration of Sharon Brown (regarding Theodore Sharp). The professor of public health averred that based on his studies, he did not believe that the Employees were likely to commit additional crimes. *See* Memo., Exh. K, Declaration of Jeffrey Fagan, Ph.D. The president of the drug and alcohol service organization attested that she believes that people who have recovered from addiction can be capable and trustworthy employees. *See* Memo., Exh. L, Declaration of Deb Beck. The director of the mental health association averred that he has hired persons with criminal records and has found them to be effective employees and good role models for the association's clients who are fighting addiction. *See* Memo., Exh. M, Declaration of Joseph Rogers.

directed the Commonwealth Parties to file their preliminary objections to the petition for review and advised the parties that the Commonwealth Court would schedule an expedited argument on the preliminary objections. *Id.* at 21.

As directed, the Commonwealth Parties subsequently filed preliminary objections, essentially claiming that the Employees and RHD had failed to state a claim for which relief could be granted. The Employees and RHD then filed a motion for summary relief pursuant to Pennsylvania Rule of Appellate Procedure 1532(a), asserting that their right to relief was clear. After hearing argument, a divided *en banc* Commonwealth Court entered an opinion and order, overruling the Commonwealth Parties' preliminary objections, granting the Employees and RHD's motion for summary relief, and declaring the criminal records chapter unconstitutional as applied to the Employees.[11] *See Nixon v. Commonwealth,* 789 A.2d 376, 382 (Pa.Commw.2001).

In assessing the constitutionality of the chapter, the majority observed that the right to engage in a common occupation is protected by Article I, section 1 of the Pennsylvania Constitution and as such, may only be restricted by legislative action that is reasonably related to a legitimate state purpose. *See id.* at 380. The majority then questioned whether the General Assembly's use of the criminal records chapter advanced any legitimate state purpose, citing to this Court's decision in *Secretary of Revenue v. John's Vending Corp.,* 453 Pa. 488, 309 A.2d 358 (1973), for the proposition that "remote convictions [are] irrelevant to predicting future behavior."[12] *Nixon,*

11. While the Commonwealth Court majority stated that the chapter was unconstitutional as applied to the "Petitioners," without distinguishing between the Employees and RHD, it appears that it only meant to declare the chapter unconstitutional as applied to the Employees. First, as noted previously, the Employees and RHD only sought a declaration that the chapter was unconstitutional as applied to the Employees. *See supra* p. 282. Moreover, in finding the chapter unconstitutional, the majority focused its analysis almost exclusively on the chapter's application to the Employees. *See Nixon,* 789 A.2d at 382.

12. In *John's Vending Corp.,* this Court considered whether the Secretary of Revenue properly revoked John's Vending's wholesale cigarette license pursuant to a statute that provided that a license could not be

789 A.2d at 381. The majority further opined that the criminal records chapter, in effect, continually punishes convicted criminals, which is in tension with our societal intention to send criminals to prison to be rehabilitated.[13] *Id.* at 382. Given these considerations, and emphasizing that the Commonwealth Parties had conceded during the preliminary injunction hearing that the Employees "would make excellent

issued to a corporation if a 50% shareholder had been convicted of a crime involving moral turpitude. John's Vending's license had been revoked because a 50% shareholder had been convicted of possessing and selling alcohol as well as possessing and selling opium derivatives between fifteen and twenty years earlier. In considering whether the revocation was proper, this Court initially noted that it was reasonable for the General Assembly to include a provision in the statute concerning the character of the persons being licensed to sell cigarettes. 309 A.2d at 361. We then found, however, that the General Assembly could not have intended the statute to apply to John's Vending as there was "no material relevance between the past derelictions of [the 50% shareholder] and his present ability to perform the duties required by the position." *Id.* We pointed out that because nearly twenty years had expired since the shareholder's convictions and he had held a license for twelve years without incident, it was "ludicrous to contend that these prior acts provide[d] any basis to evaluate his present character." *Id.* at 362. Accordingly, we found that where "prior convictions do not in anyway reflect upon the [applicant's] present ability to properly discharge the responsibilities required by the position, . . . the convictions cannot provide a basis for the revocation of the wholesaler's license." *Id.*

As the Commonwealth Court majority recognized, the interest sought to be protected under the statute, *i.e.,* ensuring the integrity of those selling cigarettes, is incomparable to the interest sought to be protected under the instant statute. *See Nixon,* 789 A.2d at 381; *see also id.* at 383 (noting that interest sought to be protected by OAPSA is "vastly superior" to that sought to be protected in *John's Vending* ) (Flaherty, J. dissenting). Moreover, *John's Vending* is distinguishable from the instant case because it involved an issue of statutory construction, rather than a constitutional challenge.

13. In opining as such, the majority relied on its recent decision in *Mixon v. Commonwealth,* 759 A.2d 442 (Pa.Commw.2000), *aff'd per curiam,* 566 Pa. 616, 783 A.2d 763 (2001), in which it declared unconstitutional a section of the Voter Registration Act that barred felons from registering to vote for five years after their release from prison. However, in *Mixon,* the court declared the section unconstitutional predominantly due to the fact that, for no rational reason, it permitted criminals who were registered before their incarceration to vote, but denied the same right to criminals who had not registered to vote prior to their incarceration. *See* 759 A.2d at 451. As such, the court relied only secondarily on the penalizing effect of the section. *See id.*

care workers for older Pennsylvanians," *see* N.T., 8/31/00, at 15, the majority concluded that the criminal records chapter violated the Employees' constitutional right to engage in an occupation because "no rational relationship exists between the classification imposed on the [Employees] and a legitimate governmental purpose." *Nixon,* 789 A.2d at 382.

Judge Flaherty, joined by Judge McGinley, dissented. According to Judge Flaherty, the criminal records chapter's prohibition on "the employment of individuals who have in the past displayed the inability to make sound judgments, is a reasonable means of achieving the state purpose of protecting the aged and disabled." *Id.* at 385. Judge Flaherty further found that although the restrictions imposed by the criminal records chapter "may be inequitable as applied to [the Employees]," the General Assembly had decided not to take any risks by creating exceptions for persons such as the Employees, and the court was "not permitted to legislate judicial exceptions." *Id.*

The Commonwealth Parties appealed to this Court as of right pursuant to 42 Pa.C.S. § 723.[14] They now argue that the Commonwealth Court erred in finding the criminal records chapter unconstitutional because the chapter's employment restrictions are rationally related to the General Assembly's legitimate interest in protecting the Commonwealth's vulnerable citizens, and in particular, the elderly. We disagree.

Initially, we reiterate the well-established rule that a law is presumed to be constitutional and may only be found to be unconstitutional if the party challenging the law can prove that it "clearly, palpably, and plainly" violates the Constitution. *See Consumer Party of Pa. v. Commonwealth,* 510 Pa. 158, 507 A.2d 323, 331–32 (1986) (*citing Pennsylvania Liquor Control Bd. v. The Spa Athletic Club,* 506 Pa. 364, 485 A.2d 732, 735 (1984)); *see also* 1 Pa.C.S. § 1922(3). Furthermore, in determining the constitutionality of a law, this Court may

14. This provision directs that this Court has "exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court." 42 Pa.C.S. § 723.

not question the propriety of the public policies adopted by the General Assembly for the law, but rather is limited to examining the connection between those policies and the law. *See Finucane v. Pennsylvania Milk Marketing Bd.*, 136 Pa. Cmwlth. 272, 582 A.2d 1152, 1154 (1990); *see also Parker v. Children's Hosp. of Phila.*, 483 Pa. 106, 394 A.2d 932, 937 (1978) ("the power of judicial review must not be used as a means by which the courts might substitute [their] judgment as to the public policy for that of the legislature").

■ Article I, section 1 of the Pennsylvania Constitution provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const. art. I, § 1. This section, like the due process clause in the Fourteenth Amendment of the United States Constitution, guarantees persons in this Commonwealth certain inalienable rights. *See Gambone v. Commonwealth*, 375 Pa. 547, 101 A.2d 634, 636–37 (1954); *see also Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). While the General Assembly may, under its police power, limit those rights by enacting laws to protect the public health, safety, and welfare, any such laws are subject to judicial review and a constitutional analysis. *Gambone*, 101 A.2d at 636; *Krenzelak v. Krenzelak*, 503 Pa. 373, 469 A.2d 987, 993 (1983).

■ The constitutional analysis applied to the laws that impede upon these inalienable rights is a means-end review, legally referred to as a substantive due process analysis. *See Adler v. Montefiore Hosp. Ass'n of Western Pennsylvania*, 453 Pa. 60, 311 A.2d 634, 640–41 (1973); *see also Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 500–05, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Under that analysis, courts must weigh the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize the relationship between the law (the means) and that interest (the end). *See Adler*, 311 A.2d at 640–41; *In re Martorano*, 464 Pa. 66, 346

A.2d 22, 26 (1975); *see also Moore,* 431 U.S. at 500–05, 97 S.Ct. 1932; *Lawrence v. Texas,* 539 U.S. 558, ——, 123 S.Ct. 2472, 2477, 156 L.Ed.2d 508 (2003); *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of the government."). Where laws infringe upon certain rights considered fundamental, such as the right to privacy, the right to marry, and the right to procreate, courts apply a strict scrutiny test. *See Stenger v. Lehigh Valley Hosp. Center,* 530 Pa. 426, 609 A.2d 796, 799– 802 (1992) (acknowledging right to privacy as fundamental right protected under Pennsylvania Constitution); *see also Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (women's right to terminate pregnancy is a fundamental interest protected under right of privacy); *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (recognizing right to marital privacy in the home as fundamental); *Lawrence,* 539 U.S. at ——, 123 S.Ct. at 2474 (reaffirming fundamental privacy rights). Under that test, a law may only be deemed constitutional if it is narrowly tailored to a compelling state interest. *See, Stenger,* 609 A.2d at 802; *see also Roe,* 410 U.S. at 163, 93 S.Ct. 705; *Griswold,* 381 U.S. at 485–86, 85 S.Ct. 1678.

 Alternatively, where laws restrict the other rights protected under Article 1, section 1, which are undeniably important, but not fundamental, Pennsylvania courts apply a rational basis test. *See Adler,* 311 A.2d at 640–41; *Pa. State Bd. of Pharmacy v. Pastor,* 441 Pa. 186, 272 A.2d 487, 490–91 (1971); *Pennsylvania Medical Society v. Foster,* 147 Pa. Cmwlth. 528, 608 A.2d 633, 637–38 (1992); *see also West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 392, 57 S.Ct. 578, 81 L.Ed. 703 (1937) (recognizing that most interests are not absolute and are subject to rational basis test). According to that test, which was defined by this Court almost a century ago, a law "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the

objects sought to be attained." [15] *Gambone*, 101 A.2d at 637; *see also Adler*, 311 A.2d at 640; *Pastor*, 272 A.2d at 490–91; *Foster*, 608 A.2d at 637.

■ As the Commonwealth Court below recognized, one of the rights guaranteed under Article 1, section 1 is the right to pursue a lawful occupation. *See Adler*, 311 A.2d at 640–41; *Gambone*, 101 A.2d at 636–37. Moreover, we agree with the Commonwealth Court that the criminal records chapter infringes upon Employees' right to continue in their lawful health care occupations. The right to engage in a particular occupation, however, is not a fundamental right. *See e.g.*,

15. The Commonwealth Parties argue that the rational basis test to be applied here should be much more deferential to the General Assembly. According to the Commonwealth Parties, a court must uphold a statute as rational if it can conceive of any plausible reason for the statute. *See* Commonwealth Parties' Brf. at 15 (*citing to Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Martin v. Unemployment Comp. Bd. of Review*, 502 Pa. 282, 466 A.2d 107, 111–12 (1983); *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 178, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *Middleton v. Robinson*, 728 A.2d 368, 374 (Pa.Super.1999)). Furthermore, the Commonwealth Parties maintain that a statutory classification is not unconstitutional merely because it is not made with mathematical nicety or will result in some inequity. *See* Commonwealth Parties' Brf. at 16 (*citing to Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Mathews v. Diaz*, 426 U.S. 67, 83–84, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Fritsch v. Wohlgemuth*, 19 Pa.Cmwlth. 83, 338 A.2d 706, 708 (1975); *Gondelman v. Commonwealth*, 520 Pa. 451, 554 A.2d 896, 901 (1989)). However, as is clear from a review of the cases cited by the Commonwealth Parties, those principles concern the rational basis test used in equal protection challenges and in due process challenges brought under the United States Constitution. With regard to substantive due process challenges brought under the Pennsylvania Constitution, the rational basis test is that announced by this Court in *Gambone*. Although the due process guarantees provided by the Pennsylvania Constitution are substantially coextensive with those provided by the Fourteenth Amendment, a more restrictive rational basis test is applied under our Constitution. *See Pastor*, 272 A.2d at 490–91 (explaining that Pennsylvania courts have analyzed due process challenges under rational basis test "more closely" than the United States Supreme Court). Needless to say, under the rational basis test applied under our Constitution, deference is still given to the General Assembly in that laws are presumed constitutional and the General Assembly therefore does not need to present evidence to sustain their constitutionality. *See O'Donnell v. Casey*, 45 Pa.Cmwlth. 394, 405 A.2d 1006, 1009–10 (1979).

*Gambone,* 101 A.2d at 636–37; *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896, 900–01 (1975); *see also Murgia,* 427 U.S. at 312–13, 96 S.Ct. 2562. Therefore, the criminal records chapter is subject to a rational basis test. *See Adler,* 311 A.2d at 640–41 (*citing Gambone,* 101 A.2d at 636–37).

■ The Commonwealth Parties argue that the criminal records chapter is constitutional under the rational basis test because barring convicted criminals from working in covered facilities is a reasonable means of achieving the Commonwealth's crucial interest in protecting the elderly, disabled, and sick from being victimized. There is no question that protecting the elderly, disabled, and infirm from being victimized is an important interest in this Commonwealth and that the General Assembly may enact laws that restrict who may work with these individuals. Further, barring certain convicted criminals from working with these citizens may be an effective means of protecting such citizens from abuse and exploitation. However, the criminal records chapter does not create an absolute bar on the employment of convicted criminals.[16] Rather, the immediate effect of the chapter was merely to prohibit the employment of convicted criminals who were not then working in a covered facility or who had obtained a new job in a covered facility less than a year before the effective date of the chapter, *i.e.,* July 1, 1998. *See* 35 P.S.

---

**16.** Given that the chapter does not create an absolute bar, we need not address in this case the issue of whether such a bar would be constitutionally permissible. However, we note that the courts that have addressed the rationality of this type of ban have been divided. *Compare Upshaw v. McNamara,* 435 F.2d 1188 (1st Cir.1970) (upholding Massachusetts law prohibiting the appointment of convicted felons to the police force as reasonably related to legitimate State interest); *Hill v. Gill,* 703 F.Supp. 1034 (D. R.I.1989) (upholding regulation making certain convicted felons and misdemeanants ineligible for certification as a school bus driver), *aff'd,* 893 F.2d 1325 (1st Cir.1989); *with Smith v. Fussenich,* 440 F.Supp. 1077 (D.Conn.1977) (finding statute barring all convicted felons from employment as security guards and private detectives was not rationally related to State's interest in preventing offenders from working in a business that affects public welfare, morals, and safety); *Butts v. Nichols,* 381 F.Supp. 573 (S.D.Iowa 1974) (finding statute prohibiting convicted felons from working in civil service position did not bear a rational relationship to the statute's goal of protecting the public trust).

§ 10225.508 (requiring criminal record checks of all applicants and all employees who worked at a covered facility for less than a year, but exempting from checks any employees who worked at a covered facility for more than a year). As such, the chapter no doubt permitted innumerable individuals with disqualifying criminal records to continue working with the purportedly protected population solely because they had maintained a job in a covered facility for the year preceding the effective date of the chapter. Moreover, many of these same individuals no doubt continue to work with the elderly, disabled, and infirm today, in spite of the General Assembly's apparent conclusion that convicted criminals pose an unacceptable risk to that population.

While the General Assembly is free to distinguish among ex-criminals, the distinction must satisfy the *Gambone* rational basis test by having a real and substantial relationship to the interest the General Assembly is seeking to achieve. *See Mixon,* 759 A.2d at 451 *(citing to Owens v. Barnes,* 711 F.2d 25, 26 (3d Cir.1983), *cert. denied,* 464 U.S. 963, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983)). Here, it is clear that no such real and substantial relationship exists. If the goal of the criminal records chapter is, as the Commonwealth Parties allege, to protect the Commonwealth's vulnerable citizens from those deemed incapable of safely providing for them, there was simply no basis to distinguish caretakers with convictions who had been fortunate enough to hold a single job since July 1, 1997, *i.e.,* a year before the effective date of the chapter, from those who may have successfully worked in the industry for more than a year but had not held one continuous job in a covered facility since July 1, 1997.[17]

The only conceivable explanation for the distinction between individuals who had completed a one year tenure in a covered

---

17. The criminal records chapter also makes a distinction in barring from employment only those convicted criminals who have been convicted of certain specified crimes, while permitting all other convicted criminals to be employed in covered facilities. *See* 35 P.S. § 10225.503. However, we do not question the rationality of this distinction here.

facility and those who had previously had successful tenures in covered facilities, but had not been at one facility since July 1, 1997, is that the General Assembly determined that those persons convicted of the disqualifying crimes who had been working at a covered facility for more than a year presented less of a risk because they had proven that they were not likely to harm the patient population and had established a degree of trust with their patients and management. However, if convicted criminals who had been working at a covered facility for more than a year as of July 1, 1998, were capable of essentially rehabilitating themselves so as to qualify them to continue working in a covered facility, there should be no reason why other convicted criminals were not, and are not, also capable of doing the same. In fact, according to the factual backgrounds provided by the Employees, many of the Employees worked successfully in covered facilities for years. *See supra* n. 9. Similarly, almost all of them gained the trust of their former supervisors at the covered facilities where they worked, as is apparent by the fact that their supervisors submitted declarations in which they averred that they would rehire the Employees if they could under the OAPSA.[18] *See supra* n. 10. Thus, it would seem that these Employees, like those convicted criminals who had worked at a covered facility for more than a year as of July 1, 1998, have essentially rehabilitated themselves and should be able to continue working in covered facilities.

Accordingly, we hold that the criminal records chapter, particularly with regard to its application to the Employees, does not bear a real and substantial relationship to the Commonwealth's interest in protecting the elderly, disabled, and infirm from victimization, and therefore unconstitutionally infringes on the Employees' right to pursue an occupation. *See Gambone*, 101 A.2d at 637 (striking down law as unconstitu-

---

18. We note that declarations were submitted by former supervisors of all of the Employees but Earl Nixon. Nevertheless, we find that Mr. Nixon established that he was capable of being trusted at a covered facility based on his substantial history of working in covered facilities. *See supra* n. 9.

tional for arbitrarily interfering with appellee's right to pursue business "under the guise of protecting the public interests"); *see also Mixon,* 759 A.2d at 451–52 (finding no rational basis to support statute barring criminals who were not registered to vote from registering and voting for five years after their release, but permitting released criminals, who were already currently registered, to vote); *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265, 269–70 (1995) (finding no rational basis to support statute requiring separated, divorced, or unmarried parents to provide for their children's post-secondary education, but not requiring the same of intact parents). Thus, we affirm the Commonwealth Court's order declaring the criminal records chapter unconstitutional as applied to the Employees and thereby permit the Employees to seek employment in a covered facility.[19]

Chief Justice CAPPY files a concurring opinion in which Justice NEWMAN joins.

Justice CASTILLE files a concurring opinion.

Justice EAKIN files a dissenting opinion.

19. In his concurring opinion, Chief Justice Cappy states that this Court should not rely on the one year exemption created in section 508(1) to find the criminal records chapter unconstitutional as applied, because the Employees and RHD did not specifically argue that this exemption was irrational in their pleadings. However, in conducting a due process analysis to determine if the chapter's restrictions on the Employees' right to employment are indeed rational, as the Commonwealth Parties argue, it is necessary to look at the entire effect of the restrictions and thus, the rationality of the one year exemption was appropriate for consideration. Moreover, as acknowledged by Chief Justice Cappy, the Employees and RHD directly argued during the preliminary injunction hearing that the Act was irrational based on the one year exemption. *See* N.T., 8/31/2000, at 8. ("Then the Act itself, and this is one of the reasons we think the Act is irrational, is it has a grandfathering clause, so even though the Commonwealth says my clients and others are such a great threat that we can't have them working with the most vulnerable people of society, it's okay for them to work with the most vulnerable people of society if they were still at a job they were at for 365 days of the year before July 1, 1998, i.e., the effective date of the Act."). Thus, that argument was part of the record before this Court.

### CONCURRING OPINION

Chief Justice CAPPY.

I concur in the result reached by the majority. As the equal protection approach taken by the majority was not discussed by the Appellees before our Court or raised in the filings below,[1] I do not believe that we should strike down the subject statute as unconstitutional on this basis.

I do believe, however, that the statute is infirm on the basis articulated by Mr. Justice Castille in his concurring opinion— that is, the *lifetime* ban on employment has no rational relationship to the legitimate goal of protecting our older adults from harm. As stated by Appellees, "[I]t is not as if the General Assembly made a reasoned but imperfect attempt to draw a line at some rational point; rather, it chose not to draw *any* line in favor of an outright, permanent, and absolute ban." Appellees' Brief at 31. It is this absolute ban that renders the statute constitutionally defective. Thus, I join that portion of Mr. Justice Castille's concurring opinion that would affirm the Commonwealth Court on this basis.

Justice NEWMAN joins this concurring opinion.

1. Specifically, the grounds on which the majority bases its approach were not raised by Appellees in their original Petition for Review, the Petition for Preliminary Injunction, or the Memorandum of Law submitted therewith. While mention of this argument was orally made in the hearing before Judge Dan Pellegrini regarding the Petition for Preliminary Injunction, Transcript of Proceedings, August 31, 2000, p. 8, it was not thereafter raised in the briefs to our Court. Thus, I do not believe that our Court should strike a statute on a basis that was not urged by the complaining parties. Furthermore, the General Assembly could simply eliminate the distinction that leads the majority to find the statute unconstitutional by applying the prohibition on employment to all employees and not just those who have not held a continuous job in a covered facility since July 1, 1997. As set forth herein, I believe that there is a more fundamental infirmity with the statute that would lead us to conclude that the statute is unconstitutional, and one that was clearly raised by Appellees.

## CONCURRING OPINION

Justice CASTILLE.

I agree that the statute is unconstitutional as applied to appellees and I join Mr. Justice Nigro's learned Majority Opinion in its entirety. I write separately only to briefly note my view that, in addition to the constitutional infirmity in the legislation so well articulated by the Majority, the lifetime ban which arises from the broad class of prior convictions covered by the amended Older Adults Protective Services Act (OAP-SA), 35 P.S. § 10225.101 *et seq.*, has no rational relationship to the legitimate, desired end of protecting the elderly, disabled and infirm from victimization.

There unquestionably are certain criminal offenses which are of such severity that all reasonable persons might agree that a lifetime ban from this type of employment is both rational and, indeed, required. Some debts to society cannot be entirely repaid. But it is difficult to discern a rational basis for automatically deeming an ancient conviction for theft (see appellee Curry) or for simple possession of a controlled substance (see appellees Nixon and Sharp), for example, as eternally and retroactively prohibiting otherwise qualified care workers from continued employment in these facilities.

In this regard, I would contrast the current version of the statute with the previous version, which imposed a ten-year limitation upon the criminal background check. A ten-year restriction on collateral effects of certain convictions is not unknown in the law. Thus, for example, the Rules of Evidence permit impeachment by evidence of convictions of *crimen falsi* but limit the impeachment to situations where not more than ten years have elapsed "since the date of the conviction or of the release of witness from the confinement imposed for that conviction, whichever is the later date," with an exception permitted if the probative value of the conviction substantially outweighs its prejudicial effect. Pa.R.E. 609(b).

To be deemed rationally related to the undeniably legitimate interest the General Assembly sought to further, the legislation in this area can be, and should be, much more finely

tuned. Finer tuning, including perhaps some form of time limitation for certain crimes (or graduated time restrictions tied to the particular type of crime) would seem particularly called for here. In this regard, I note the helpful amicus brief jointly filed by no less than twelve diverse organizations, including senior citizen organizations, organizations advocating the interests of abused women, and labor organizations. Amici note:

OAPSA's lifetime bar on employment based upon a single criminal conviction at any time in an individual's life has prevented fine caregivers like the petitioners from providing services to needy Pennsylvanians, even where those convictions are decades old and have no bearing on the individual's present character or ability to perform such jobs.... OAPSA [also] lacks any mechanism to consider the circumstances surrounding an individual's offense or the individual's post-conviction efforts at rehabilitation.

These deficiencies in OAPSA's criminal record provisions have grave consequences for all affected parties. Rehabilitated workers are prevented from earning a living. Service providers, many of which are already faced with a shortage of qualified applicants for jobs that often pay low wages and involve difficult work, are deprived of the opportunity to employ persons whom they believe to be good caregivers. Vulnerable adults are deprived of the excellent care that could be provided by the appellees in this action and many other ex-offenders like them.

Brief of Amici Curiae Pennsylvania Alliance for Retired Americans et al., 12. The overly-blunt means chosen to effectuate this well-intentioned legislation may operate to create unnecessary dangers for the very citizens it was designed to protect. I am confident that the General Assembly will revisit this area and find more pointed means to achieve its worthy objective.

### DISSENTING OPINION

Justice EAKIN.

The majority concludes the General Assembly's preclusion of employment of certain enumerated convicts in designated

elder care facilities has "no real and substantial relationship" to the provisions of the criminal records chapter of the Older Adults Protective Services Act (OAPSA), and therefore finds this legislation unconstitutional. I find such provisions precisely effectuate the stated and important governmental interest of protecting older adults incapable of safeguarding themselves. I respectfully dissent.

The majority notes the General Assembly's reasoning:

It is declared the policy of the Commonwealth of Pennsylvania that older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare. . . . It is the intent of the General Assembly to provide for the detection and reduction, correction or elimination of abuse, neglect, exploitation and abandonment, and to establish a program of protective services for older adults in need of them.

Majority Opinion, at 279–80 (citing 35 P.S. § 10225.102). Following such acknowledgment, the majority then concedes:

There is no question that protecting the elderly, disabled, and infirm from being victimized is an important interest in this Commonwealth and that the General Assembly may enact laws that restrict who may work with these individuals. *Further, barring certain convicted criminals from working with these citizens may, in fact, be an effective means of protecting such citizens from abuse and exploitation.*

*Id.*, at 288 (emphasis added). It is only because there is not a ban on existing employees that the majority finds this legislation fails constitutional muster. However, under "rational basis" review,[1] the legislature is not required to substantiate

1. Citing *Pa. State Bd. of Pharmacy v. Pastor*, 441 Pa. 186, 272 A.2d 487 (1971), the majority suggests this Court has scrutinized substantive due process claims under our Constitution "more closely" than the United States Supreme Court has under the federal constitution; therefore, federal rational basis case law is no longer valid. Majority Opinion, at 287, n. 15. A complete reading of *Pastor* reveals this Court has at times

the entire scheme, nor does it have the "obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Indeed, "[i]t could be that '[t]he assumptions underlying these rationales [are] erroneous, but the fact that they are 'arguable' is sufficient, on rational-basis review, to 'immunize' the [legislative] choice from constitutional challenge.' " *Id.*, at 333, 113 S.Ct. 2637 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 320, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Even unexpected, inequitable results do not form the basis of constitutional infirmity. *See Gondelman v. Commonwealth*, 520 Pa. 451, 554 A.2d 896, 901 (1989). Further, this Court, in *Gondelman*, adopted the United States Supreme Court's rational basis rationale when dealing with unintended, or potentially unjust, results: "The problems of government are practical ones and may justify, if they do not require, rough accommodations illogical, it may be, and unscientific. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id.* (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)) (internal citations omitted).

Here, appellees claim they are being denied employment based upon distant convictions, and such discrimination bears no relation to a valid state concern. Relying on this Court's holding in *Secretary of Revenue v. John's Vending Corp.* 453 Pa. 488, 309 A.2d 358 (1973), appellees argue they have been "rehabilitated," and the remoteness of these dated convictions do not represent their current propensity to re-offend. However, as noted by Judge Flaherty, writing for the Commonwealth Court dissent:

> departed from the federal reasoning only as it relates to "local economic legislation" because "state courts may be in a better position to review local economic legislation than the Supreme Court....Thus Pennsylvania, like other state 'economic laboratories,' has scrutinized regulatory legislation *perhaps more closely* than would the Supreme Court of the United States." *Pastor,* at 490 (citations omitted) (emphasis added). This case does not pertain to economic restrictions levied against local businesses in need of more state protection than afforded under the federal constitution. Consequently, the federal authority pertaining to rational basis review in this area is still viable.

Moreover, unlike *John's Vending* where the Court agreed that 'the legislature did not intend to bring his convictions within the purview of [the] statute', the legislature, by amending [OAPSA] in 1997 and removing the ten year look back period imposed in 1996, has clearly stated its intention that anyone convicted of any of the enumerated crimes at any time in their life, is precluded from working for facilities covered by the Act.

*Nixon v. Commonwealth,* 789 A.2d 376, 384 (Pa.Cmwlth.2001) (Flaherty, J., joined by McGinley, J., dissenting). Clearly, *John's Vending* is inapplicable here. Further, some drug and deviant convictions, as proscribed by the Act, will assuredly forever block appellees from other endeavors and potential employments. *See* Pa. Const. art. 2, § 7 (prohibition against public office holder for conviction of "infamous crime"); *Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631, 638 (1980) ("a bar against the employment of convicted felons as police officers would probably be reasonable since 'a person who has committed a felony may be thought to lack the qualities of self-control or honesty that this sensitive job requires.' ").

Just because the General Assembly has not subjected some tenured workers to summary termination does not mean the restrictive hiring mechanism now in place has no relation to fulfilling the General Assembly's objective. In actuality, and as referenced by the majority, this legislation will certainly detect and reduce the number of potentially dangerous staff members working with older Pennsylvanians. Erecting a hiring roadblock to the inflow of proven criminal offenders is not unconstitutional simply because others already beyond the roadblock were not forced out. Eventually, this legislation will eliminate those with convictions for the enumerated offenses from working in any covered institution. Wisdom often comes late, to court and legislature alike, and the failure to enact it when petitioners were hired does not make it less wise. This legislation is a rational means to a rational end.

This legislation is similar to other legislative efforts to begin "cleansing" certain at-risk facilities. *See* 23 Pa.C.S.

§ 6344(c)(2) (regarding prospective child-care personnel: "In no case shall an administrator hire an applicant if the applicant's criminal history record information indicates the applicant has been convicted of one or more of the following offenses ...."); and 24 Pa.C.S. § 1–111 (public or private school employment prohibition for applicants with convictions of enumerated offenses). It has a proper and rational basis supporting the underlying goal of more security for Commonwealth seniors. Accordingly, I would find this legislation constitutional and offer my dissent.