**D.C., K.C. and K.J., Appellants**

v.

**SCHOOL DISTRICT OF PHILADELPHIA.**

Commonwealth Court of Pennsylvania.

Argued March 2, 2005.

Decided July 20, 2005.

Marsha L. Levick and Len Rieser, Philadelphia, for appellants.

Scott F. Cooper, Philadelphia, for appellee.

John O. J. Shellenberger, III, Philadelphia, for Amicus Curiae, Office of Attorney General.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, and SIMPSON, Judge.

OPINION BY Judge SMITH–RIBNER.

Juveniles D.C., K.C. and K.J. (Students) appeal from an order of the Court of Common Pleas of Philadelphia County in their action filed as a class action seeking a declaration that Section 2134 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended,* added by Section 19 of the Act of June 29, 2002, P.L. 524, 24 P.S. § 21–2134, is unconstitutional and requesting an injunction against its enforcement. Section 2134 relates to the disposition of certain public school students in Philadelphia who are returning from juvenile delinquency placement or criminal conviction. The trial court denied the Students' motion for summary judgment and granted the cross-motion for summary judgment filed by the School District of Philadelphia (School District).

## I. Background

In June 2002 the legislature added Section 2134 to Chapter 21 of the School Code relating to school districts of the first class. The Philadelphia School District is the only school district of the first class among the 500 school districts. Initially, Section 2134 provided that any student returning from placement or who was on probation as a result of being adjudicated delinquent under 42 Pa. C.S. Chapter 63, the Juvenile Act, 42 Pa.C.S. §§ 6301—6365, or who had been adjudged to have committed a crime in an adult criminal

proceeding, should not be returned directly to the regular classroom. Rather, the School District was required to place each such student in a transition center operated by the School District for up to four weeks and to develop a transition plan that set academic goals, identified school and community services appropriate to the student's needs and established terms and conditions for the student to meet before returning to the classroom.

The School District then was required to place the student in one of four alternative education settings. They include: an "alternative education program" as defined in Article XIX–C of the School Code, headed *"Disruptive Student Programs,"* added by Section 11 of the Act of June 25, 1997, P.L. 297, 24 P.S. §§ 19–1901–C—19–1905–C; a "private alternative education institution" as defined in Article XIX–E, headed *"Private Alternative Education Institutions for Disruptive Students,"* added by Section 5 of the Act of November 9, 1999, P.L. 529, 24 P.S. §§ 19–1901–E—19–1903–E; a general educational development (GED) program; or a school program operating after the traditional school day (twilight program).

In September 2002 two students filed a complaint challenging Section 2134, and on December 9, 2002 the legislature amended the section. As amended, Section 2134 still requires the School District to place students returning from juvenile delinquency placement (but not on probation) or criminal conviction into a transition center for up to four weeks and to develop transition plans. Further:

(c) The transition plan developed under subsection (b)(2) may provide for the student's direct return to a regular classroom where the underlying offense did not involve any of the following:

(i) Possession of a weapon.

(ii) Possession, use or sale of controlled substances as defined in the Act of April 14, 1972 (P.L. 233, No. 64), known as "The Controlled Substance, Drug, Device and Cosmetic Act."

(iii) Possession, use or sale of alcohol or tobacco by any person on school property.

(iv) An act of violence as defined in section 1310–A(h) [added by Section 3 of the Act of November 22, 2000, P.L. 672, 24 P.S. § 13–1310–A(h) ].

Subsection (d) provides that a student whose transition plan does not provide for immediate return to the regular classroom shall be placed in one of the four alternative education settings; subsection (e) specifies information to be provided.

On January 17, 2003, an amended complaint was filed naming D.C., K.J. and K.C. as additional plaintiffs and withdrawing certain legal claims stated in the original complaint. The amended complaint alleged that D.C. was a sixteen-year-old student who attended 10th grade during 2001–2002. In May 2002 he was arrested for unauthorized use of an automobile, and he was adjudicated delinquent on that charge and was placed in a residential placement facility until his discharge in August 2002. Reports indicated that he "adjusted well to the program" and "worked well with others." D.C. was not allowed to return to his high school, and he was advised to report to a transition center. Thereafter, he was assigned to an alternative school for disruptive students operated by Community Education Partners; it does not offer inter-scholastic sports and has limited scholastic opportunities. K.J. and K.C. had similar experiences.[1]

---

1. The amended complaint alleged that K.J. was a sixteen-year-old attending middle

The amended complaint alleged that of the approximately 1400 students in residential placement, only one in four had committed crimes against persons and that most events for which they were adjudicated took place outside of school. It stated that special procedures pursuant to a Federal court decree apply to transfer to disciplinary schools in Philadelphia and that Chapter 19 of the School Code defines "disruptive student" specifically and requires a hearing affording due process protection and a determination that an individual actually violated the School District's Code of Student Conduct before transfer to a facility for disruptive students. The amended complaint asserted violation of the prohibition in Article III, Section 32 of the Pennsylvania Constitution against local or special legislation; the Equal Protection Clause of Article I, Section 26 of the Pennsylvania Constitution; the due process clauses of Article I, Section 1 and Section 11 of the Pennsylvania Constitution; and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

After several court conferences, the parties agreed that there were no material issues of fact in dispute and that discovery would provide no benefit. The Students filed a motion for summary judgment, and the School District filed a cross-motion for summary judgment.[2] After noting the heavy burden involved in challenging the constitutionality of a statute, the trial court first considered whether Section 2134 is special legislation in violation of Article III, Section 32. The court initially concluded that Section 2134 applied uniformly to school districts of the first class. Under federal equal protection analysis, which applies to Article III, Section 32 claims, the court stated that disruptive and violent students have a deleterious effect on the education process and that there is a legitimate state interest in ensuring that students returning from placement and those in regular classrooms receive an education without fear of disruption and/or violence.

school in 2000—2001 who had many absences and was tardy and who, in October 2000, also was charged with unauthorized use of an automobile. He was adjudicated delinquent in January 2001, and he was placed in a residential treatment program where he remained until June 2002. There he attended classes, received passing grades and earned credits to complete 9th and 10th grades, with the residential placement described as a success. He also was told that he could not return to a regular school; after a week at a transition center he was permitted to attend 11th grade at the same Community Education Partners school as D.C.

K.C. was an eighteen-year-old with serious truancy problems. In November of 2000 he was arrested for possession of marijuana, and he signed a consent decree requiring him to attend school. When his truancy continued, he was adjudicated delinquent on the possession of marijuana charge. He was placed in residential placement, where he accepted responsibility for his mistakes, demonstrated a good work ethic and attitude and had out-standing academic performance. He also was directed to a transition center; he was then told that he would be assigned to a twilight program, although allegedly he was not given a starting date until several months later. While waiting, he earned a GED. He was never offered return to a regular school.

2. The dissenting opinion comments on the absence of class certification in the trial court. Neither any party nor the amici have raised any issue concerning class certification. The trial court accepted the procedure chosen by the parties and ruled upon the cross motions for summary judgment. *See Appeal of Borough of Churchill*, 525 Pa. 80, 575 A.2d 550 (1990) (discussing broad authority of trial court to regulate the practice and procedure before it). As the matter is not jurisdictional, the Court may not raise it sua sponte. Also, the Students sought declaratory relief, which could readily have been requested by individuals proceeding alone.

The court concluded that Section 2134 met the applicable reasonable relationship test.

The trial court rejected the Students' contention that Section 2134 violates the equal protection provision of Article I, Section 26 of the Pennsylvania Constitution, which provides: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." The court disagreed with the Students' argument that a fundamental right to reputation was involved, stating that the classification made by Section 2134 was based solely upon population. Because Section 2134 did not target suspect classifications, nor was based on grounds warranting intermediate scrutiny, the court concluded that the rational basis review applied. It stated that, because of the School District's large size, returning students would be less likely to receive individual attention and might fail to adjust and then cause disruption to the learning environment.

Regarding the claim of violation of the Due Process Clause of the Federal Constitution, the trial court noted that in Pennsylvania there is a statutory entitlement to a public education, see Section 1301 of the School Code, 24 P.S. § 13–1301. The Students argued that their assignment to an alternative education setting under Section 2134 was the equivalent of a disciplinary transfer, which should be afforded the same due process protections other students receive when transferred, suspended or expelled. The court found controlling the difference that the Students here were not in a regular school when they were assigned to the transition center and the alternative settings, and it accepted the School District's argument that the students were already removed when they sought reentry to the public schools and

that Section 2134 operates as an "administrative" mechanism to evaluate returning students and to place them in an appropriate educational setting. Further, students subject to Section 2134 still received a public education.

Regarding allegations of stigma, the trial court cited the leading case of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), for the "stigma plus test" under federal due process principles. The United States Supreme Court rejected the proposition that reputation alone is a "liberty or property" interest sufficient to invoke federal constitutional due process protections, apart from some more tangible interests such as employment. Regardless of whether any stigma attached to the Students by virtue of their being sent to the alternative education setting, the trial court concluded that the Students did not meet the second prong of the test: it did not affect a property interest and it was not disciplinary in character.

The trial court also addressed the Students' contention that Section 2134 impermissibly creates an irrebuttable presumption. It noted that in *Department of Transportation, Bureau of Driver Licensing v. Clayton*, 546 Pa. 342, 684 A.2d 1060 (1996), the court rejected assertions that the doctrine had been invalidated and held that an entitlement given by the state such as a driver's license may not be taken away arbitrarily by a presumption that cannot be challenged in a meaningful manner. The trial court did not regard Section 2134 as effecting removal from the regular classroom and concluded that it did not create an irrebuttable presumption that deprived the Students of a protected interest or entitlement.

Finally, the trial court addressed the Students' argument that Section 2134 violated due process principles under the Pennsylvania Constitution, based upon as-

sertions that being assigned to an alternative education setting harmed their reputations and that there was no opportunity for them to challenge or to object to the assignment. The court reviewed the holding in *R. v. Department of Public Welfare*, 535 Pa. 440, 636 A.2d 142 (1994), and it noted that the Pennsylvania Constitution affords citizens a protected property interest in reputation while the United States Constitution does not. Nonetheless, the court agreed with the School District that any harm to the Students' reputations resulted solely from the juvenile adjudication and held that Section 2134 simply inserted an administrative process into the Students' rehabilitative journey and that the Students received maximum procedural due process protections at the time they were adjudicated delinquent.[3]

## II. Special Legislation

■ The Court turns first to the Students' contention in Part II of their brief that Section 2134 is impermissible special legislation, because a decision in their favor on this point would invalidate the entire statute. Article III, Section 32 of the Pennsylvania Constitution, relating to certain local and special laws, provides:

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
>
> 1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts....

Article III, Section 20, relating to classification of municipalities, provides that the legislature "shall have the power to classify counties, cities, boroughs, school districts, and townships according to population, and all laws passed relating to ... any class ... shall be deemed general legislation within the meaning of this Constitution." Section 202 of the School Code, 24 P.S. § 2–202, classifies a school district having a population of one million or more as a first class school district.

In *Harrisburg School District v. Zogby*, 574 Pa. 121, 136, 828 A.2d 1079, 1088 (2003), the court explained that the Article III, Section 32 special legislation prohibition and other provisions such as the Uniformity Clause, Article XIII, Section 1, "have been understood to include principles of equal protection under the law" and warranted like treatment to the Equal Protection Clause of the United States Constitution. Such principles, however, did not "vitiate the Legislature's power to classify" nor "prohibit differential treatment of persons having different needs, provided the classifications at issue bear a reasonable relationship to a legitimate state purpose." *Id.* at 137, 828 A.2d at 1089 (citations omitted). Further, "a classification, though discriminatory, will be deemed reasonable if any state of facts reasonably can be conceived to sustain it." *Id.* at 137, 828 A.2d at 1089 (citations omitted).

The Students argue that although the legislature may adopt targeted legislation in appropriate circumstances, Section 2134 actually creates a subclass—Philadelphia youth adjudicated delinquent returning from juvenile placement—without any substantial relationship between the goals of the legislation and the decision to apply it to Philadelphia students only. The Students refer to reports referenced in support of their motion for summary judgment indicating that two other counties

---

**3.** The Court's review of a trial court's grant of summary judgment is limited to determining whether the trial court committed an abuse of discretion or an error of law. *Atlantic City Electric Co. v. United School District,* 780 A.2d 766 (Pa.Cmwlth.2001).

had higher delinquency rates than Philadelphia. They cite *Allegheny County v. Monzo*, 509 Pa. 26, 44, 500 A.2d 1096, 1105 (1985), where in discussing an Article III, Section 32 challenge the court stated: "Classification is allowed because of necessity ... springing from manifest peculiarities clearly distinguishing those of one class from each of the other classes and imperatively demanding legislation for each class separately...." Also in *DeFazio v. Civil Service Commission of Allegheny County*, 562 Pa. 431, 756 A.2d 1103 (2000), the court determined that the statute imposing special civil service regulation requirements on sheriff's employees in counties of the second class (Allegheny County) had in essence created a new subclassification and improperly treated them differently from similar officers in the state merely because they were in a particular class.

As the School District notes, "[a] statute duly enacted by the General Assembly is presumed valid and will not be declared unconstitutional unless it 'clearly, palpably and plainly violates the Constitution.'" *Zogby*, 574 Pa. at 135, 828 A.2d at 1087 (quoting *Purple Orchid, Inc. v. Pennsylvania State Police*, 572 Pa. 171, 178, 813 A.2d 801, 805 (2002)). The courts frequently have rejected challenges to legislation as applicable to only one class of school district or city. *See, e.g., Danson v. Casey*, 484 Pa. 415, 399 A.2d 360, 367 (1979) (up-holding revenue structure applicable only to first class school district). The School District, amicus Commonwealth and amici Presiding Officers (Senate President *pro tempore* and Speaker of the House of Representatives), emphasize that in *Zogby* the court upheld legislation that as a practical matter created a classification currently limited only to the Harrisburg School District.[4] In a reply brief the Students contend that Section 2134 does not apply uniformly even within the School District, and they maintain that *DeFazio* may not be distinguished and that, unlike in *Zogby*, there are no codified legislative findings here regarding a pilot program.

On the narrow issue of whether the legislature may establish a formal transition procedure in a first class school district for students returning from juvenile placement or conviction, as distinct from the issue of a right to hearing before placement elsewhere, the Court concludes that the Legislature did not violate Article III, Section 32. As the briefs indicate, each year the Philadelphia School District receives between 1200 and 1500 students returning from juvenile placement. The sheer numbers of students overall and of returning students justify a legislative conclusion that a formal transition program is reasonable to assess the status of the returning students and to establish transition plans to attempt to enhance their

4. The Presiding Officers note the permissibility of different treatment "provided the classifications at issue bear a reasonable relationship to a legitimate state purpose," *Zogby*, 574 Pa. at 137, 828 A.2d at 1088, and they argue that Section 2134 has an unquestionably legitimate governmental purpose of seeking to minimize disruption in regular classrooms. The School District relies on excerpts from the statement of the House Speaker, John M. Perzel, offering his views before the Urban Affairs Committee's subcommittee about the disruptive classroom effects of "ex-offenders" and "formerly incarcerated students" re-turning to a traditional school setting. School District Brief, at 7—8. The Commonwealth and the Presiding Officers, moreover, stress the permissibility of classifications based upon school district size, rebut the claim of creation of a subclass and dispute that returning students are entitled to a hearing. Finally, they note that in *Zogby* the court approved narrowing the classification to a very small group under a pilot program, stating that "there is nothing improper about this method of attacking social problems of statewide dimension...." *Zogby*, 574 Pa. at 140 – 141, 828 A.2d at 1090–1091.

chances of success upon return. Under the broad deference afforded the legislature in *Zogby*, the Court cannot conclude that such a program, without more, clearly, palpably and plainly violates Article III, Section 32.

### III. Due Process

■ Entirely distinct issues are raised, however, in regard to the Students' claim that they have a right to a hearing to challenge an assignment to some setting other than a regular classroom. The Students assert that except where Section 2134 comes into play, under Section 1902–C(2) of the School Code, 24 P.S. § 19–1902–C(2), students are afforded an informal hearing complying with the procedures set forth in 22 Pa.Code § 12.8(c) (relating to hearings) before they may be transferred to an alternative education program for disruptive students. Identical language appears in Section 1902–E(2), 24 P.S. § 19–1902–E(2), regarding transfer to a private alternative education institution under Article XIX–E.[5] They also assert that, by virtue of the holding that delinquency hearings afford due process necessary to effect disciplinary transfers, the trial court has conceded that the Students' assignments to alternative schools implicate due process protections.

First, the Students contend that the trial court erred in holding that Section 2134 does not violate the Due Process Clauses of the United States and Pennsylvania Constitutions. It erroneously characterized the transfer of returning students under Section 2134 as "administrative" rather than "disciplinary" action, although by its own terms Section 2134 provides for placement of students in public or private alternative education programs or institutions created for "disruptive" students. In *Everett v. Marcase*, 426 F.Supp. 397 (E.D.Pa.1977), where involuntary transfers between regular schools for disciplinary reasons were at issue, the court rejected the School District's contention that the matter did not deprive a student of any constitutionally cognizable property right. The court acknowledged that a school district "may for purely administrative purposes, assign pupils from one school to another." *Id.*, 426 F.Supp. at 400. It stated, however: "An administrative transfer is vastly different from a disciplinary transfer. . . . The terminology of a 'disciplinary' transfer suggests punishment. Even though such transfers may in certain specific instances be for the good of the pupil as well as the transferring school, it nonetheless bears the stigma of punishment." *Id.* Moreover, the Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), held that where a state establishes a free public school system, a pupil may not be suspended from school even temporarily without some form of procedural due process.

---

**5.** Section 1901–C(1), 24 P.S. § 19–1901–C(1), has since enactment in 1997 defined "Alternative education program" as one that removes disruptive students from the classroom, but it also has provided: "Programs may include services for students returning from placements or who are on probation resulting from being adjudicated delinquent in a proceeding under 42 Pa.C.S. Ch. 63 (relating to juvenile matters) or who have been judged to have committed a crime under an adult criminal proceeding." The definition of "Private alternative education institution" in Section 1901–E, 24 P.S. § 19–1901–E, incorporates the definition from Section 1901–C(1). These provisions applicable statewide expressly authorize placement in the return situation at issue in the present case, apart from actual removal from a classroom. Sections 1902–C(2) and 1902–E(2), 24 P.S. §§ 19–1902–C(2) and 19–1902–E(2), require that applicant school districts have established policies to identify those students who are eligible for placement in the program or assignment to the institution and that the placement of such students will comply with the informal hearing procedures set forth in 22 Pa.Code § 12.8(c) (relating to hearings).

The Students argue that the trial court erroneously concluded that all required procedural protections were provided in the delinquency hearings. The court reiterated in *Clayton* that " 'the essential elements of due process are notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause[.]' " 546 Pa. at 351, 684 A.2d at 1064 (quoting *Soja v. Pennsylvania State Police*, 500 Pa. 188, 194, 455 A.2d 613, 615 (1982)). The Students emphasize that a delinquency hearing addresses one set of issues, namely, the student's responsibility for his or her criminal or delinquent behavior and, if adjudicated delinquent, the proper disposition. No jurisdiction exists for deciding a student's fitness to return to the regular classroom after placement based on factors such as academic progress. As in the case of K.J. that decision may be made well over one year later.

The Students maintain that the Due Process Clause is implicated when state action results in stigma. Under the "stigma plus" test from *Paul* a plaintiff must show (1) some utterance of a statement that is sufficiently derogatory to injure his or her reputation, which is capable of being proved false, and (2) some material and state-imposed burden or alteration of his or her status or of a right. They argue that Section 2134 brands a wide variety of youth, adjudicated for both violent and non-violent offenses, as disruptive and not fit to attend regular classes, regardless of whether they actually are. In *Goss* the Supreme Court noted that even the relatively brief suspensions at issue there could seriously damage the students' standing with their fellow pupils and teachers "as well as interfere with later opportunities for higher education and employment." *Goss*, 419 U.S. at 575, 95 S.Ct. at 736, 42 L.Ed.2d at 735.

The Students renew their argument that Section 2134 creates an irrebuttable presumption that all Philadelphia students returning from juvenile placement must be assigned to a transition center and that certain of these students must be referred to an alternative education setting for disruptive students. Section 2134 relies upon the basic fact of adjudication of delinquency to justify a presumed fact, i.e., that all these students are dangerous or disruptive, with no opportunity to rebut the presumption. Likewise, Section 2134 creates an irrebuttable presumption that all returning students, or at a minimum all subject to the automatic exclusion under Section 2134(c), would be disruptive and dangerous in a regular classroom.[6]

Finally, they note that under the Pennsylvania Constitution, a citizen's interest in reputation is afforded even higher protection than under the United States Constitution. In *R. v. Department of Public Welfare* the court held that because reputation is expressly mentioned in Article I, Sections 1 and 11, it is a fundamental interest that may not be abridged without constitutional protections. The Students strongly dispute the trial court's conclusion that Section 2134 caused no separate and distinct harm. They reference *Nixon v. Department of Public Welfare*, 576 Pa. 385, 839 A.2d 277 (2003), and *Warren County Human Services v. State Civil Service Commission (Roberts)*, 844 A.2d 70 (Pa.Cmwlth.), *appeal denied*, 581 Pa. 687, 863 A.2d 1152 (2004), where the courts

---

**6.** The trial court incorrectly stated in its opinion at page 8 n7 that none of the three Students' underlying offenses involved the criteria set forth in Section 2134(c) and that they lacked standing to challenge that provision. As noted in n1 above, K.C. was adjudicated delinquent on a charge of possession of marijuana, which falls under Section 2134(c)(ii).

invalidated statutes that excluded persons from applying for jobs in elder-care and child-care facilities if they had criminal records of enumerated offenses but that allowed some or all of those currently employed to remain. The courts held that, in the substantive due process challenges, there was no rational basis for concluding that while existing employees had become rehabilitated and had performed safely others could not, and that the means chosen lacked a substantial relation to the object.

The School District cites the analysis of procedural due process set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976): courts must consider the private interest affected; the risk of an erroneous deprivation of such an interest; the probable value of additional safeguards; and the government's interest, including burdens to it from providing additional procedures. The true crux of the School District's argument is the assertion that Section 2134 does not impact a protected right because it is not disciplinary in character. It agrees that school administrators may not label students as disruptive and remove them from regular classrooms without due process, but it contends that the Students' removal was not by the School District but instead was by the juvenile court. Also the School District and amici maintain that any stigma to the Students' reputations arose from the fact of their delinquency adjudications. The School District notes the court's conclusion reached in *R. v. Department of Public Welfare* under the *Mathews* analysis, and it argues that *Nixon* and *Warren County Human Services* do not apply because the Students did not raise a substantive due process claim. In any event, the School District asserts that Section 2134 is rational and is related to the constitutional mandate of providing students a free appropriate public education.[7]

The School District continues to maintain that the United States Supreme Court all but abandoned the irrebuttable presumption doctrine in favor of a rational basis analysis in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The Presiding Officers argue that Section 2134 does not create an irrebuttable presumption, at least where a student did not commit one of the offenses specified in Section 2134(c), because the School District may return the student to the regular classroom. The School District contends that if Section 2134 affects any rights, it fully comports with due process because the students received complete due process safeguards in the delinquency proceedings. Further, only a minimal interest is involved if there is any deprivation of rights, and the burden on the School District in providing a hearing would outweigh that minimal interest.

Based on its review, the Court in general is persuaded by the Students' due process arguments. On the pivotal question of whether the assignments to an alternative education setting under Section 2134 are disciplinary or merely administrative in character, the Court observes first that the structure and framework of Section 2134 unquestionably supports the Students' characterization. As amended, Section 2134 provides that after evaluation in a transition center a returning student may be returned to a regular classroom, unless his or her offense triggers the auto-

**7.** The Commonwealth notes that cases finding damage to reputations have involved matters such as public accusations of a crime, *see Carlacci v. Mazaleski,* 568 Pa. 471, 798 A.2d 186 (2002), or reports associating attorneys with fraudulent insurance claims, *Pennsylvania Bar Ass'n v. Commonwealth,* 147 Pa. Cmwlth. 351, 607 A.2d 850 (1992).

matic exclusion under Section 2134(c). Thus, under Section 2134, a decision is made after the student's return whether to send the student to a regular classroom or to an alternative setting, and that decision must be based upon some rationale. The placement of returning students in an alternative setting is based upon a determination that the student is not currently fit for the regular classroom, and that determination is not guided by any ascertainable standard other than that the student was previously adjudicated delinquent.

There is no doubt that placements under Article XIX–C and XIX–E are made to programs specifically designated for "disruptive" students, and nothing in the record supports the School District's assertion that Section 2134 students are not intermingled with ones sent there for being disruptive. The School District and others attempt to characterize placements from the transition center as being equivalent to discretionary placements based upon purely administrative concerns. However, they nowhere assert that any students other than those determined to be disruptive following procedures under 22 Pa.Code § 12.8 or students returning from juvenile placement are sent to these schools for purely administrative reasons.

The Court finds telling the fact that the trial court, the School District and the Amici, when discussing the rational basis that the legislature had for adopting Section 2134, consistently and repeatedly refer to the need to address the problem of the return of disruptive and violent students from juvenile placement and the legitimate need of the School District to protect the regular classroom environment against disruption. To say in the same breath that the exclusion of these students is not disciplinary is simply untenable. Furthermore, the Court does not agree that the due process afforded in the juvenile adjudication addressed the interests raised here.

In delinquency proceedings, the juvenile court lacks jurisdiction over the decision on a student's school placement upon return. The initial decision on a returning student's fitness for the regular classroom is designed to be made at the transition center, and that decision turns on factors that could not be known at the time of the juvenile adjudication. Simply stated, the juvenile proceeding is not adapted to consideration of the matter at issue in this case. *Clayton; Soja.*

For some students, subject to the automatic exclusion under Section 2134(c), there is no possibility of immediate return to the regular classroom. Under *Clayton,* these students are subject to an irrebuttable presumption that they are not fit to return. As in *Clayton,* where a regulation prevented a driver from presenting evidence on the central issue of his medical fitness to drive, Section 2134(c) creates an irrebuttable presumption that certain returning students are not fit for the regular classroom, regardless of whether the student performed in an exemplary manner during juvenile placement or otherwise does not pose a threat to the regular classroom setting. In *Clayton* the court found a violation of procedural due process in the failure to provide an opportunity to challenge on the central issue, and the same is true in this case in regard to Section 2134(c). In *Goss* the Supreme Court explained that the fundamental requirement of due process is the opportunity to be heard in a hearing that is appropriate for the situation presented. Recognizing the difficulties faced by "vast and complex" schools and the need for school officials to maintain order, the Supreme Court nevertheless required that effective notice and some informal hearing be afforded a disciplined student to allow for "a meaningful

hedge against erroneous action." *Id.*, 419 U.S. at 583, 95 S.Ct. at 741, 42 L.Ed.2d at 740. Thus the Court holds that the absence of any opportunity for returning students to challenge their transfer to an alternative education setting violates due process.

## IV. Equal Protection

■ There remains only the Students' contention that the trial court erred in failing to provide heightened scrutiny to their claim of a violation of the equal protection provision of Article I, Section 26 of the Pennsylvania Constitution. Heightened scrutiny applies where a law affects a fundamental right or discriminates against a suspect class. *Petition of Berg,* 712 A.2d 340 (Pa.Cmwlth.), *aff'd,* 552 Pa. 126, 713 A.2d 1106 (1998). The trial court, they argue, failed to follow *R. v. Department of Public Welfare,* which held that Pennsylvania regards reputation as a fundamental right. Therefore, it failed to require strict scrutiny. This Court has stated: "Under a strict scrutiny analysis, the burden is on the government to demonstrate that the law is narrowly tailored to achieve a compelling governmental interest." *Petition of Berg,* 712 A.2d at 342. The Students contend that Section 2134 cannot withstand strict scrutiny because Pennsylvania can demonstrate no compelling interest in mandating the removal of only Philadelphia adjudicated delinquent youth returning from placement from regular classrooms without any procedural safeguards whatsoever.

The School District posits that Philadelphians or adjudicated delinquents do not make up any suspect classification, and the right to a public education is not a fundamental right but rather a statutory one, which is limited by statutory provisions. *Lisa H. v. State Board of Education,* 67 Pa.Cmwlth. 350, 447 A.2d 669 (1982), *aff'd,* 502 Pa. 613, 467 A.2d 1127 (1983). Further, it notes that the courts have repeatedly upheld the rationality of treating Philadelphia and the School District differently. *See, e.g., Danson.* The Presiding Officers adopt the trial court's position that Section 2134 classifies by school district; therefore, strict scrutiny is not triggered.

The Court's conclusions on the issues discussed above inform the outcome here. As the Court noted in n5 above, Sections 1901–C(1) and 1901–E of the School Code, which apply statewide, have always provided for students returning from juvenile placements to be placed in their respective programs. Equally important, the Court has agreed with the Students that procedural due process is required when a returning student seeks to challenge the assignment to an alternative education setting. Therefore, because the Students' concerns have been addressed, the Court need not review further the equal protection claims.

## V. Relief

The Court clearly has not concluded that the entire transition scheme established by Section 2134 is unconstitutional. To the contrary, the Court is aware of the principle embodied in Article III, Section 14: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." The Court similarly is aware of the seriousness of reintegrating large numbers of students returning from juvenile placements and therefore does not find the transition program to be wholly flawed, particularly with regard to student referral to the transition center for up to four weeks to allow for a plan setting goals and conditions for the students to meet.

■ In two respects, however, the Court concludes that Section 2134 is un-

constitutional. First, protected due process interests are involved in the decision that a particular student who wishes to return to the regular classroom may not do so. Although a hearing is not required in all cases before a student may be assigned to an alternative education setting, in those cases where a student seeks to challenge the assignment there must be available some opportunity to do so. *See Goss.* The trial court, relying on School District figures, noted that none of the 617 students who entered the transition program as of January 22, 2003 had returned to regular classrooms and stated that it would have *"serious concerns"* if subsequent reports showed that virtually no students were ever returned to regular classrooms. Trial court, slip op. at 9 n.9. The School District has not dispelled the concerns.

The informal hearing provided for in 22 Pa.Code § 12.8(c) is well suited to the process of challenging an assignment to an alternative education setting. As indicated in n5 above, in Sections 1902–C(2) and 1902–E(2) of the School Code the legislature expressly acknowledged students' due process rights in regard to the disciplinary placement decision and expressly accommodated those rights by adopting the informal hearing procedures of 22 Pa.Code § 12.8(c). This procedure thus supersedes other statutory due process provisions in regard to this particular subject. *See* Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933, providing that the particular controls the general. Specific requirements of Section 12.8(c) include: written notice to the parents or guardian of the reasons for the action, an offer to hold an informal hearing within the first five days of the action, sufficient notice of the time and place of the informal hearing, the right of the student to question witnesses present at the hearing and the right of the student to speak and to produce witnesses in his or her own behalf. This procedure preserves the basic elements of due process protection without burdening the school district with the more elaborate requirements specified for a formal hearing that is mandated for expulsion actions. *See* 22 Pa.Code § 12.8(b).

Second, in regard to Section 2134(c), the inflexible prohibition against a return to the regular classroom for students adjudicated delinquent or convicted of specified underlying offenses represents an unconstitutional irrebuttable presumption and violates procedural due process under *Clayton.* Accordingly, Section 2134(c) is unconstitutional to the extent that it precludes consideration in an informal hearing, if one is requested, of the central issue of whether a student is currently fit to return to the regular classroom after completing the transition center assignment for up to four weeks. Therefore, the Court shall reverse in part the trial court's grant of summary judgment to the School District and denial of summary judgment to the Students. The absolute denial of any opportunity for the Students to challenge their transfer to an alternative education setting violates due process.

Judge COHN JUBELIRER and Judge LEAVITT did not participate in the decision in this case.

### ORDER

AND NOW, this 20th day of July, 2005, the order of the Court of Common Pleas of Philadelphia County granting the motion for summary judgment filed by the School District of Philadelphia is affirmed to the extent that it concluded that Section 2134 of the Public School Code of 1949, 24 P.S. § 21–2134, is not special legislation in violation of Article III, Section 32 of the Pennsylvania Constitution, and it is otherwise reversed. The order denying the mo-

tion for summary judgment filed by D.C., K.C. and K.J. is reversed in part. Section 2134(c) is invalidated as unconstitutional to the limited extent that it establishes an absolute bar to consideration of a student's fitness to return to a regular classroom without affording the student an opportunity to challenge pursuant to the informal hearing procedures in 22 Pa.Code § 12.8(c) a decision by the transition center to place the student in an alternative education setting.

Concurring and Dissenting Opinion by Judge SIMPSON.

I agree with the majority's resolution of the Students' special legislation challenge to Section 2134 of the School Code (Transition Statute).[1] However, I respectfully dissent from the conclusions regarding a denial of procedural due process. For the reasons that follow, I would affirm the grant of summary judgment to the School District of Philadelphia.

First, the named Students[2] failed to present a factual basis to prevail because they failed to prove any deprivation whatsoever.

By agreement, the case proceeded to summary judgment without any discovery and without any hearing. Reproduced Record (R.R.) at 3a–4a. Although the

School District made an extensive submission in support of its motion, see Supplemental Reproduced Record, the named Students did not. Thus, there is neither testimony nor affidavit from any witness for the named Students, including from the named Students themselves.

At the summary judgment stage, a party may not rest on the pleadings but must identify expected proof. Pa. R.C.P. No. 1035.3. However, the named Students offer no proof to substantiate their claims that the statutory process is interrupting and disrupting their educational programs, that their placements pursuant to the Transition Statute are stigmatizing and injuring their reputations, or that the programs to which they are assigned are not comparable to those available in regular schools. Amended Complaint ¶¶ 101–03, R.R. at 14a. Moreover, they offer no proof at all that they belong in regular classrooms rather than in alternate placement.

The Students bear a heavy burden of overcoming the presumed constitutionality of the statute. *DeFazio v. Civil Serv. Comm'n of Allegheny County*, 562 Pa. 431, 756 A.2d 1103 (2000). Their failure to offer any factual support for their claims of deprivation is fatal.[3]

1. Section 2134 of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended,* added by the Act of June 29, 2002, P.L. 524, *as amended,* 24 P.S. § 21-2134.

2. The docket entries fail to reveal that the mandatory class certification hearing was held or that a ruling was made on class certification. Reproduced Record (R.R.) at 1a–6a. This is significant for two reasons. First, because a court may not enter summary judgment against the class before ruling on class certification, the summary judgment here binds only the named Students. Pa. R.C.P. No. 1715(a); Pa. R.C.P. No. 1715(a) cmt. Second, the typicality of the named Students'

claims and their right to represent the class is not established. Pa. R.C.P. No. 1702(3). In this regard, the named Students were not adjudicated delinquent on one of the offenses enumerated in the Transition Statute which precludes direct return to a regular classroom. Amended Complaint ¶¶ 12, 24, 35, R.R. at 11a, 13a, 14a. Therefore, they are not adversely affected by that provision and lack standing to challenge it in their own right. *See Parents United for Better Sch., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 166 Pa.Cmwlth. 462, 646 A.2d 689 (1994).

3. *Compare Everett v. Marcase*, 426 F.Supp. 397 (E.D.Pa.1977), relied upon by Students,

Second, the Students fail to identify an established interest the deprivation of which deserves procedural due process protection. In particular, the Students fail to allege and prove total exclusion from the educational process or removal from regular classes by operation of the Transition Statute.

The Fourteenth Amendment to the United States' Constitution forbids a State to deprive any person of life, liberty or property without due process of law. Protected interests in property are normally not created by the Constitution. Rather, they are created and their dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *see Levine v. Dep't of Educ.,* 79 Pa.Cmwlth. 357, 468 A.2d 1216 (1984) (to be entitled to a due process hearing, one must have suffered the loss of a property or liberty interest, and denial of a promotion to a college professor involved neither).

In Pennsylvania, a student may not be suspended or expelled without a hearing. Section 1318 of the School Code, 24 P.S. § 13–1318. Students must be afforded all appropriate elements of due process if they are to be excluded from school. 22 Pa.Code § 12.8(a). Students here, however, are not suspended, expelled or excluded from school by the Transition Statute. Instead, the Transition Statute only affects students already removed from regular class by the juvenile court.

The named Students cite no statute or regulation upon which a right to reenter regular class is based. My independent research discloses no source for such a right. In the absence of a property right to reenter regular class after removal by the juvenile court, due process does not attach. *See Schmader v. Warren County Sch. Dist.,* 808 A.2d 596 (Pa.Cmwlth.2002) (15–minute disciplinary detention was not exclusion from school rising to constitutional deprivation); *Adamek v. Pennsylvania Interscholastic Athletic Ass'n, Inc.* 57 Pa.Cmwlth. 261, 426 A.2d 1206 (1981) (no property right to participation in interscholastic athletics).[4]

Federal cases do not compel a different result. Thus, in *Goss v. Lopez,* 419 U.S. at 576, 95 S.Ct. 729, the United States Supreme Court concluded that students' "total exclusion from the educational process" implicated a property interest in education worthy of due process protection. This protection was extended somewhat by the district court in *Everett v. Marcase,* 426 F.Supp. 397 (E.D.Pa.1977) to a disruptive, involuntary transfer out of a regular class to another location. Neither of those situations is present here. Students are not totally excluded from the education process by the Transition Statute. Also, Students are not removed from a regular class by the Transition Statute. Instead, they are returning to the public school after removal by the juvenile court. *See Dallam v. Cumberland Valley Sch. Dist.,* 391 F.Supp. 358 (M.D.Pa.1975) (property interest in education created by Pennsylvania is

where hearings were held and an extensive record of deprivation was made.

**4.** Named Students also claim a liberty interest in stigma-free reputation. In the absence of any offer to prove harm to reputation by operation of the Transition Statute, we need not decide whether such an interest warrants due process protection. This is especially

true here, where the preexisting adjudication of delinquency and the exceptional disposition to a placement facility create obvious causation questions. *See Roman v. Appleby,* 558 F.Supp. 449 (E.D.Pa.1983) (discussing embarrassment from juvenile court proceedings).

participation in the entire process, not each separate activity).

Third, the named Students distort the significance of the predicate disposition by the juvenile court. They argue that the adjudication of delinquency is remote in time and without information pertinent to a return to public school. However, it is not the adjudication of delinquency that is significant here; rather, it is the momentous disposition of removal from the community and commitment to a juvenile facility that is crucial to understanding why the Transition Statute operates reasonably.

In juvenile court proceedings, delinquency adjudication is the functional equivalent of establishment of guilt in adult criminal court. *See* 42 Pa.C.S. § 6341. After a finding that a child committed acts which would constitute crimes if committed by an adult, a juvenile court must also determine whether the child is in need of treatment, supervision or rehabilitation. 42 Pa.C.S. § 6341(b).

Thereafter, the juvenile court makes a decision regarding disposition. This is the functional equivalent of a sentence in adult criminal law. This is usually done with the aid of a comprehensive social study and investigation. 42 Pa.C.S. § 6339. The report covers "the child, his family, his environment, and *other matters relevant* to disposition of the case." *Id.* (emphasis added). As such, it includes information about school attendance and performance.

Several disposition choices are available to the juvenile court, the most serious of which is removal from the family and community and commitment to an institution. 42 Pa.C.S. § 6352(a).[5] The juvenile court chooses the disposition option:

> determined to be consistent with the protection of the public interest and best suited to the child's treatment, supervi-

---

5. This section of the Juvenile Act provides in pertinent part:

(a) General rule. If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community:

(1) Any order authorized by section 6351 (relating to disposition of dependent child).

(2) Placing the child on probation under supervision of the probation officer of the court or the court of another state as provided in section 6363 (relating to ordering foreign supervision), under conditions and limitation the court prescribes.

(3) Committing the child to an institution, youth development center, camp, or other facility for delinquent children oper-

ated under the direction or supervision of the court or other public authority and approved by the Department of Public Welfare.

(4) If the child is 12 years of age or older, committing the child to an institution operated by the Department of Public Welfare.

(5) Ordering payment by the child of reasonable amounts of money as fines, costs, fees or restitution as deemed appropriate....

(6) An order of the terms of probation may include an appropriate fine considering the nature of the act committed or restitution not in excess of actual damages caused by the child....

In selecting from the alternatives set forth in this section, the court shall follow the general principle that the disposition imposed should provide the means through which the provisions of this chapter are executed and enforced consistent with section 6301(b) (relating to purposes) and when confinement is necessary, the court shall impose the minimum amount of confinement that is consistent with the protection of the public and the rehabilitation needs of the child.

sion, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community.

*Id.* When confinement is necessary, the juvenile court shall impose the minimum amount of confinement that is consistent with the protection of the public and the rehabilitation needs of the child. *Id.*

The primary purpose of the Juvenile Act is the preservation of family unity whenever possible. 42 Pa.C.S. § 6301(b)(1), (3); *In Interest of Justin S.,* 375 Pa.Super. 88, 543 A.2d 1192 (1988). So, it is improper to place a child in the custody of a state agency until the juvenile court considers and rejects alternative dispositions which would allow a child to remain with parents. *In Interest of Ryan Michael C.,* 294 Pa.Super. 417, 440 A.2d 535 (1982). Consistent with this authority, residential placements are rarely the first disposition. Such placements separate a child from family, school, and community, and they are expensive. Those of us with juvenile court experience well know that residential placements are normally ordered as a last resort. As here, placements extend months, not days.

The juvenile court remains involved during the months of residential placement. The juvenile court must review such a placement every six months and shall hold a formal disposition review hearing at least every nine months. 42 Pa.C.S. § 6353(a).

Further, as here, the juvenile court frequently remains involved after release through continuing probation and aftercare programs. Amended Complaint ¶ 41, R.R. at 15a.

Thus, it is not the adjudication hearing that is most significant in the present context. More important are the subsequent social study and report, disposition hearing, and disposition review hearings. During these stages all relevant, current information about a child, including educational information, is gathered, and determinations of the degree of restriction are made. The named Students fail to acknowledge the ongoing, comprehensive role of the juvenile court in disposition.

In essence, it is the severity of the predicate disposition, usually reserved as a last resort, rather than the fact of adjudication, which explains why the Transition Statute operates reasonably. The Transition Statute only applies to delinquent and criminal students in such extreme circumstances that they must be removed from family, school and community for an extended period. They are fully protected by the court.[6] As discussed, there is a rational basis for the Transition Statute to operate in this manner.

For these reasons, I would affirm.

Judge LEADBETTER joins in this dissent.

---

**6.** In juvenile court, all hearings are conducted with full procedural safeguards, including notice, right to counsel, right to introduce evidence and cross-examine witnesses, and the privilege against self-incrimination. 42 Pa. C.S. §§ 6336–38.